**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| Cameron Kelly,<br>      Plaintiff,<br><br>    v.<br><br>Richland County School District Two;<br>Keith Price, in his Official and Individual<br>Capacity; Kathy Trout, in her Official and<br>Individual Capacity; and Fletcher Spigner,<br>in his Official and Individual Capacity,<br><br>      Defendants. | C/A No.: 3:15-CV-01963-MBS<br><br>**PLAINTIFF'S MEMORANDUM OF<br>LAW IN OPPOSITION TO<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT** |

## I.  INTRODUCTION

Plaintiff Cameron Kelly ("Plaintiff" or "Cameron"), by and through his undersigned counsel, hereby respectfully submits this Memorandum in Opposition to Defendants Richland County School District Two ("District" or "RCSD2"), Keith Price ("Price"), Kathy Trout ("Trout"), Stephen Spigner ("Spigner") (Price, Trout, and Spigner hereinafter collectively "Individual Defendants") (collectively "Defendants") Motion for Summary Judgment ("Motion"). Cameron, a former student of Blythewood High School ("BHS" or the "School"), located within the District, filed this action against Defendants alleging claims for violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504"); disability discrimination in violation of the Americans with Disabilities Act as amended ("ADA"); gross negligence/negligence per se; and violation of the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983. Based upon this memorandum, applicable statutory and case law, and any other documents filed or to be filed with this Court, Plaintiff hereby requests that this Court deny the Defendants' Motion.

1

## II.     FACTUAL BACKGROUND

From the 2010-2011 school year until the 2013-2014 school year, Plaintiff attended Blythewood High School located in Blythewood, South Carolina. (Price Aff., p. 56; C. Kelly Aff., p. 8.) Plaintiff suffers from Type 1 Diabetes[1] and has been since the age of nine. (C. Kelly Aff., par. 2; C. Kelly Depo., p. 48; T. Kelly Aff., par. 7.) Type 1 diabetes causes the body not to manufacture insulin, which is a major life activity.  Unlike Type 2 diabetes, Type 1 Diabetes only can be managed, not cured. Individuals, such as Plaintiff, must manage their Type 1 diabetes by balancing between having too much blood sugar (hyperglycemia) and having too little blood sugar (hypoglycemia). This management is complicated, especially for juveniles, which creates a significant risk for children afflicted with Type 1 diabetes. (C. Kelly Depo., pp. 48-52; T. Kelly Depo., p. 135, Ex. 4; T. Kelly Aff., pars. 7-9.)

Prior to the 2013-2014 school year, Plaintiff was issued an Individualized Health Plan ("IHP"). (T. Kelly Depo., p. 135, Ex. 4; T. Kelly Aff., par. 11.)  The District's IHP indicated some of the signs of low blood sugar, which include, but are not limited to, sweating, confusion, shaking, fatigue, blurry vision, and a loss of coordination. (T. Kelly Depo., p. 135, Ex. 4; C. Kelly Aff., pars. 6-7; T. Kelly Aff., pars. 7-9.)

**Events Leading Up To BHS Prom**

On April 24 and April 25, 2014, Plaintiff became severely ill due to complications with his diabetes, causing Plaintiff to be absent from school. (T. Kelly Aff, pars. 13, 14; T. Kelly Depo., pp. 57-63, Ex. 3.) During this time, Plaintiff's mother had to take time off from her job to care for Plaintiff, whose condition caused him to appear and exhibit signs of being "drunk." (T. Kelly

---

[1] Diabetes is a serious chronic disease that impairs the body's ability to use food for energy and results in high levels of glucose in an individual's blood. Specifically, Type 1 Diabetes usually afflicts children and young adults when the body's immune system destroys pancreatic beta cells that make insulin.

2

Depo, pp. 57-63, Ex. 3.) On April 24, Plaintiff was suffering from hyperglycemia. (T. Kelly Depo, pp. 57-63, Ex. 3; T. Kelly Aff., pars. 13-16.) On April 25, Plaintiff was still sick due to fluctuating blood sugar levels which caused vomiting. (T. Kelly Aff., par. 14.) While Plaintiff was ill, his mother provided the District with written documentation explaining the reason for his absences and the complications from Plaintiff's diabetes. (*Id*. at par. 18; T. Kelly Depo., pp. 57-63, Ex. 3.) Plaintiff remained ill on April 26, the day of the prom, but was making progress; Plaintiff's parents decided to allow Plaintiff to attend the BHS prom since it would be Plaintiff's last opportunity. (T. Kelly Aff., par. 15.)

**April 26, 2014: BHS Prom**

On the evening of April 26, 2014, BHS held its prom at the Columbia Convention Center. (C. Kelly Depo., p. 22.) Plaintiff was feeling well the morning of BHS prom and decided he was well enough to attend. Plaintiff's blood sugar was high before he went to the prom, so he took insulin to attempt to correct the hyperglycemia and lower his blood sugar. (C. Kelly Depo., p. 50.)

Plaintiff attended the prom with three other students. (T. Kelly Aff., par. 15; C. Kelly Depo., pp. 16-22). Prior to the prom, they went to one of the student's homes and to Plaintiff's grandparents' house to take pictures and go to the prom together. (C. Kelly Depo., pp. 16-22, 62, Ex. 2.) Plaintiff's group ate dinner together and stopped at Sonic for "slushies" before arriving at the prom. (C. Kelly Depo., pp. 16-22). At no time did Plaintiff consume alcohol. (C. Kelly Aff., par. 11; C. Kelly Depo., p. 16, 62, Ex. 2.)

Plaintiff was socializing and dancing with another BHS student when a School Resource Officer ("SRO") pulled Plaintiff away and took Plaintiff to Price; Price immediately asked what Plaintiff had had to drink. (C. Kelly Depo., pp. 24, 61-62, Ex. 2). According to Defendant Trout, Plaintiff had appeared "unsteady" on the dance floor. (Trout Depo., p. 46, Ex. 6.) Plaintiff was

3

taken to another SRO where Plaintiff requested a breathalyzer and consented to a search of Plaintiff's vehicle, both of which would have put the issue to rest, but both were denied. (C. Kelly Depo, p. 26). Defendant Spigner then approached Plaintiff and told Plaintiff to sit down as Plaintiff was "clearly hammered." (*Id*. at 27, 62, Ex. 2.) At no point during this interrogation of Plaintiff did the individually-named Defendants, other BHS staff, or the SRO contact Plaintiff's parents. (*Id*. at 35.)

Plaintiff did not consume any alcohol at any point during the day of BHS' prom. (*Id.* at 16*.*) After he was nonetheless excluded due to a suspicion of being under the influence, Plaintiff was permitted to contact his grandparents to come get him. (P. Rutledge Aff., par. 8; J. Rutledge Aff., par. 8.) Plaintiff was fearful that he would go to jail for being under the influence, though he denied drinking alcohol. (P. Rutledge Aff., pars. 9-10; J. Rutledge Aff., pars. 9-10.) When Plaintiff's grandparents arrived, they questioned him thoroughly and determined that he was not drunk and had not consumed alcohol. (P. Rutledge Aff., par. 15; J. Rutledge Aff., par. 15.) They checked the alcohol that was in their poolhouse, where Plaintiff and his friends gathered before the prom, and determined that all of the alcohol was sealed. (P. Rutledge Aff., pars. 17-20; J. Rutledge Aff., pars. 17-20.)

Plaintiff was ultimately recommended for expulsion for being under the influence of alcohol at the prom. The recommendation was made by Defendant Trout and supported by Defendant Price, the principal at the time. Any indications that Plaintiff was drunk, however, were attributable to the symptoms of Type 1 Diabetes complications, as set forth in Plaintiff's IHP. (*Id*. at 33; T. Kelly Aff., p. 11; T. Kelly Depo., p. 135, Ex. 4). The administrators who pursued Plaintiff's expulsion, Defendant Price and Defendant Trout, had not reviewed Plaintiff's IHP prior to the prom and had no knowledge of Plaintiff's disability. (Price Depo, pp. 48-49, 79-85; Trout

4

Depo., p. 53.) No BHS employee at the prom ever asked Plaintiff about his blood sugar levels or his diabetes. (C. Kelly Depo., p. 35.) No provisions had been made for any nurse to be at the BHS prom, even though there were students present who were subject to individualized health plans necessitating the involvement of a nurse or a faculty member trained by a nurse to assist with the students' care. (Spigner Depo., pp. 11, 14, 21-28.)

Defendant Trout admitted that the conduct for which Plaintiff was recommended for expulsion could be attributed to hypoglycemia, as asserted by Plaintiff, rather than alcohol consumption. (Trout Depo., at 53.) Though a hearing officer ultimately determined not to expel Plaintiff, the threats by administration, removal from the prom, subsequent suspension, harassment, and cloud of suspicion caused Plaintiff to suffer suicidal thoughts, have physical manifestations of his anxiety, and have other stress that continues to the present.

### III.     STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be rendered when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), *quoted in Mincey v. U.S. Postal Service*, 879 F. Supp. 567, 571 (D.S.C. 1995). When deciding on a motion for summary judgment, the facts and inferences to be drawn from the evidence must be viewed in light most favorable to the non-moving party. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). The moving party "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick County Commr's*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## IV. ARGUMENT

### A. The District is Not Entitled to Judgment On Plaintiff's Claims Under Section 504 and the ADA.

There are genuine issues of material fact that preclude Defendants' Motion on Plaintiff's claims under Section 504 and the ADA. At a minimum, District's removal and subsequent recommendation of expulsion of Plaintiff creates a factual question of discriminatory motive to be decided by a jury. Furthermore, as a matter of law, the Plaintiff has adduced evidence to satisfy the elements of his claims and is entitled to present his case to a jury.

Section 504[1] provides, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705 (20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" *See* 29 U.S.C. § 794. For Plaintiff to prevail on his Section 504 claim, he must show: (1) that he is an individual with a disability qualified to participate in an educational program; (2) he is being excluded from participation in, being denied the benefits of, or being subject to discrimination under the program solely by reason of his disability; and (4) the relevant program or activity is receiving federal financial assistance. *See M.H. v. Montgomery County Bd. Of Educ.*, 784 F. Supp. 2d 1247, 1261 (M.D. Alabama, Northern Division 2011).

Section 504 and the ADA, generally, prohibit school districts from discriminating against individuals with disabilities in programs and activities. *See* 29 U.S.C. § 794. Section 504 also places affirmative duties on school districts perform certain tasks, which include, but are not

---

[1] Plaintiff will address his claims under Section 504 and the ADA using case law construing either statute. Courts have construed these statutes to impose similar requirements. *See Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 461 (4th Cir. 2012).

6

limited to, notifying parent of availability of services under Section 504, evaluating students to determine whether h/she needs special education or related services; providing accommodation plans to students with disabilities, and to ensure students protected under Section 504 are not discriminated against through school discipline as a result of their disability. *See* 28 C.F.R. 104.32; 28 C.F.R. §35.130.

In this case, the Defendants, with knowledge of Plaintiff's condition and recent episodes, denied him the protections afforded him under Section 504 and excluded him from participating in his senior prom. While Defendants may contest and defend their actions, they may not contend their actions are not material facts in dispute. Therefore, the Defendants' Motion should be denied.

> **1. Whether The District Acted In Bad Faith or With Gross Misjudgment In Excluding Plaintiff From The Based On His Disability Is a Factual Question To Be Determined By A Jury.**

Beginning with Plaintiff's initial removal from prom, the Defendants' actions toward Plaintiff create a factual dispute whether the Defendants acted in bad faith or with gross misjudgment concerning Plaintiff. The Defendants cite an absent of evidence showing "rise or drop in blood sugar levels[2]," and "Plaintiff needed assistance in monitoring his blood sugar levels" the night of prom as definitive proof that Plaintiff's Diabetes was not a complicating issue. [ECF No. 20-1 at 10]. However, the Defendants' references only further show that the District, specifically the Individual Defendants, displayed gross misjudgment by not first determining whether Plaintiff's Diabetes was a contributing factor to his disoriented appearance.

---

[2] Plaintiff's testimony is being taken out of context. Plaintiff testified at his deposition that he does not remember his blood sugar levels the night of April 26, 2014, but that he assume that he felt well enough to drive to prom. Plaintiff also only testifies about the likelihood he tested his blood sugar levels prior to entering prom. Plaintiff has provided no testimony concerning his blood sugar levels on the night of April 26, 2014 after entering prom or at the time he was removed by BHS personnel.

7

In determining whether a student experienced discrimination under Section 504, courts have not required "direct evidence personal animosity, ill will, or malice" to demonstrate bad faith or gross misjudgment. *See K.D. v. Starr*, 55 F. Supp. 3d 782, 790 (D. Md. 2014). The Eighth Circuit has reasoned that "'[u]nder some circumstances, notice of a student's disability coupled with delay in implementing accommodations can show bad faith or gross misjudgment.'" *Starr* 55 F. Supp. 3d at 790-91 (quoting *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 888 (8th Cir. 2013)). "Within the Fourth Circuit, district courts have similarly found bad faith or gross misjudgment in the absence of direct evidence of personal animosity or ill will." *Starr* 55 F. Supp. 3d at 791. In *N.T. v. Balt. City Bd. Of Sch. Comm'rs*, the court found sufficient allegations of bad faith or gross misjudgment where a school system previously provided adequate accommodation to a student in middle school and suspended a student with an emotional disability for fighting. *See* 2011 U.S. Dist. LEXIS 94237, 2011 WL 3747751, at 6-8 (D. Md. Aug. 23, 2011).

Here, the Defendants admit to a laundry list of actions demonstrating an indifference towards accommodating Plaintiff or other similarly-situated disabled students. The troublesome actions and inactions at issue here include, but are not limited to, the following:

- Defendant Spigner admits to never providing a nurse at prom. (Spigner Depo., p. 28);

- Defendant Spigner admits to not reviewing Plaintiff's IHP in preparation for the prom. (Spigner Depo., pp. 21-22);

- Defendant Price admits that Plaintiff does not admit to drinking in his statement and that a Section 504 disabled student is provided a manifestation determination. (Price, Depo., p. 95);

- The Individual Defendants admit that they did not contact Plaintiff's parents as required by District policy. (T. Kelly Aff., pp. 1-2; T. Kelly Depo., pp. 135-36); and

8

- Defendant Price did not know about diabetes. (Price, Depo., pp. 48-49, 79, 85).

In addition to the above, it is undisputed that a nurse, trained about diabetes, was absent from the prom in violation of Plaintiff's IHP. The consideration of the District's actions, especially the actions taken after being informed or re-informed of Plaintiff's diabetic condition, they continued to pursue expulsion. These facts are compelling and create an inference of bad faith or gross misjudgment that deserves to be presented to a jury.

### 2. The Plaintiff's IHP in Lieu of a 504 Plan Does Not Absolve the District From Affording Plaintiff All of the Protections and Benefits Under Section 504 and the ADA.

The existence of Plaintiff's IHP does not preclude the Defendants from providing Plaintiff with all the protections and benefits available under Section 504. The Office of Civil Rights has held that a school district cannot substitute an IHP for a Section 504 plan. *See Fayette County (KY) Sch. Dist.*, Complaint No. 03-05-1061, 45 IDELR 67 (OCR 2005); *see also San Diego (CA) City Unified Sch. Dist.*, Complaint No. 09-04-1150, 44 IDELR 135 (OCR 2005). Thus, when a student, such as Plaintiff, is eligible for services under Section 504, an IHP is not in and of itself an adequate substitute for a properly developed 504 plan. *See Clarksville-Montgomery County (TN) Sch. Dist.*, Complaint No. 04-10-5003, 60 IDELR 203 (OCR 2012) (holding that an IHP could comply with the requirements of 504, but only if students with IHPs were evaluated for 504 eligibility in appropriate cases and given the law's other procedural protections); *see also Rock Hill (OH) Local Schs.*, Complaint No. 15-05-1181, 106 LRP 35138 (OCR 2005) (holding that the district incorrectly believed that an IHP was an adequate substitute for a 504 evaluation for a student with diabetes).

Here, the District's assertion that Plaintiff did not have a 504 plan, but an IHP still evidences the District's continuous error in judgment in failing to have safe harbors in place for

9

students such as Plaintiff in the event of a problem. Even District nurse Beth Gladden[3] advises Plaintiff's mother that the District believes that IHPs are not adequate for addressing students with chronic health issues and has moved away from them. *See* Gladden Email, August 19, 2015. Consequently, the District is not entitled to summary judgment there is a factual question as to whether Plaintiff's IHP was appropriate for him at the time of the 2014 BHS prom.

### 3. Because the District Was Informed of Plaintiff's Disability, Plaintiff Should Have Received a Manifestation Determination Prior to Being Recommended for Expulsion.

The District cannot obtain judgment, as a matter of law, on Plaintiff's Section 504/ADA claims when it had prior knowledge of Plaintiff's medical condition. *See Halpern*, 669 F.3d 454, 465 (4th Cir. 2012); *see also Brown v. Metro. Sch. Dist. of Lawrence Twp*., 945 F. Supp. 1202, 1207 (S.D. Indiana 1996) ("While normally a disabled student may not be expelled without a prior determination that the actions for which she is being expelled were not causally related to her disability . . . this is not the case if the student was not identified as disabled prior to the events leading to the expulsion. . . . Thus, Defendant was not required to consider the effect of [student's] disability on her actions before expelling her, so Defendant could not have violated § 504 by failing to do so").

The District's failure to provide Plaintiff a manifestation determination prior to excluding him from senior prom and recommending him for expulsion constitutes disability discrimination to which Plaintiff should not have been subjected. The Defendants concede that Section 504 requires a manifestation determination review ("MDR") for disciplinary actions that would cause an eligible student a change in placement. [ECF No. 20-1 at 14] (citing 34 CFR 104.35 and *Dunkin*

---

[3] This document was provided to Defendants' counsel at the time of Plaintiff and his parents' deposition without a Bates stamp.

*(MO) R-V Sch. Dist.*, 52 IDELR 138 (OCR 2009)). The District also acknowledges that a student's conduct is a manifestation of h/her disability if: "(1) the conduct in question was caused by, or had a direct and substantial relationship to, the [student's] disability; or (2) the conduct in question was the direct result of the LEA's failure to implement the IEP." [ECF. No. 20-1 at 14] (citing 20 USC § 1415(k)(l)(F) and *M.G. v. Crisfield*, 547 F. Supp. 2d 399, 419-20 (D.N.J. 2008).

It has never been Plaintiff's contention that a review would determine whether the false allegations of Plaintiff's drinking actually occurred[4] but rather that the MDR would demonstrate that Plaintiff's actions were a direct result of his Type 1 diabetes. The District urges that Plaintiff could have been subjected to disciplinary action even with an MDR because there is no evidence to support that Plaintiff's "misconduct (admitted drinking)" was causally connected to his diabetes. [ECF No. 20-1 at 15-16]. Plaintiff did not admit to drinking alcohol. It is undisputed that Plaintiff was identified and removed from prom because BHS personnel were uninformed about his medical condition and thought he appeared lightheaded, unstable, or lethargic. (Price, Depo., p. 57). It also is undisputed that, no later than prior to the expulsion hearing, administration knew or should have known that Plaintiff's Type 1 diabetes caused symptoms that made him appear "drunk" and that he recently had suffered from a severe diabetic episode. (Price, Depo., p. 49, Ex. 4; T. Kelly Aff., p. 1) Therefore, it is reasonable to conclude, had the Defendants not violated Plaintiff's Section 504 rights and provided the appropriate accommodations and protections, Plaintiff would never been wrongfully disciplined. Therefore, Defendants' Motion should be denied, and Plaintiff should be allowed to present his case at trial.

### B. Summary Judgment Should Be Denied As To Plaintiff's Claim Under The Equal Protection Clause And 42 U.S.C. § 1983.

---

[4] Plaintiff adamantly has maintained that he did not consume alcohol on the night of April 26, 2014 throughout this litigation and prior administrative proceedings.

11

The Equal Protection Clause of the Constitution mandates that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Cont. Amend. XIV, §1.  As acknowledged by Defendants, "disabled people have a constitutional right not to be subject to arbitrary or irrational exclusion from services, programs, or benefits provided by the state." (Def. Mem., at p. 17.)  This right applies to the services, programs, or benefits provided by a public school district. *See Bd. Of Trs. Of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367-68 (2001).

The District does not dispute that Plaintiff was treated differently than other students with disabilities.  In fact, Mr. Spigner, Mr. Price, and Dr. Trout testified that other students with visible disabilities, who were "profoundly handicapped," or who needed a third-party to accompany to the prom were afforded accommodations at the prom. (Spigner Depo., pp. 17-19; Price Depo., pp. 55-56; Trout Depo., p. 22.)  No such accommodations were provided to students such as Plaintiff with life-threatening but not readily visible disabilities, though they were similarly-situated in their need and right to be accommodated at the school-sponsored prom as a matter of state and federal law and District policy.

The District contends that, since it "would work with parents and families to provide accommodations requested to assist students with special needs or disabilities" (Def. Mem., p. 18), it is relieved from its obligations to Plaintiff, whose parents were not among those with whom the District worked to provide accommodations. (T. Kelly Depo., pp. 34, 40, 44; T. Kelly Aff., p. 2; Spigner Depo., 17, 28.)  This contention is problematic as a constitutional matter when the only explanation for why Plaintiff, who was entitled to a nurse and trained personnel that could recognize and address hypoglycemia at school-sponsored events, got no accommodations was that administrators hoped parents would contact administrators with a reminder of their legal obligations to their son. (Spigner Depo., pp.28-29.)

This practice is not rational and resulted in administration jumping to an erroneous conclusion about Plaintiff's disability-based behavior, removing him from enjoying his senior prom, and causing Plaintiff extensive damages. *See infra,* (Price Depo., p. 57). The Defendants were all aware that students with disabilities would likely be attending the prom due to their clearly-established statutory rights to accommodation. Nevertheless, despite Defendants' responsibility for planning and overseeing the prom, they took steps to follow their own policies and applicable law except for cherry-picked students. As for Plaintiff, they did nothing. There was no nurse available. There were no trained staff members. There was no practice or procedure for sharing information about accommodations prior to the prom. There was no call to Plaintiff's parents, though Defendants contend that Plaintiff was inebriated. Instead of following the District's own policies and Plaintiff's Individualized Health Plan, there was simply a conclusion that Plaintiff, suffering from hypoglycemia, was under the influence of alcohol, and a decision to interrogate Plaintiff in front of his peers, threaten him with jail, and recommend him for expulsion.

Defendants' inaction regarding Plaintiff is shocking to the conscience, as it would be to any reasonable official under the circumstances. The individual Defendants are not entitled to qualified immunity and should be held accountable for their role in bringing about the damages to Plaintiff. Accordingly, Defendant's motion for summary judgment should be denied as to Plaintiff's cause of action for the denial of Plaintiff's right to equal protection.

### C. **Summary Judgment Should Be Denied As To Plaintiff's Negligence Claim.**

The Defendant District contends that it is immune from liability for Plaintiff's negligence claim under the South Carolina Tort Claims Act. The burden of establishing a limitation upon liability or an exception to the waiver of immunity under the Tort Claims Act is upon the governmental entity asserting it as an affirmative defense. *See Steinke v. South Carolina Dep't of*

*Labor, Licensing and Regulation*, 336 S.C. 373, 393, 520 S.E.2d 142, 152 (1999).  Here, however, the Defendant District cannot meet this burden.

### 1. There Is A Genuine Issue Of Material Fact As To Defendant District's Failure To Exercise Slight Care.[5]

Pursuant to the South Carolina Tort Claims Act, a public school district may be held liable for damages caused by its supervision or protection of students where the public school district is grossly negligent.  S.C. Code Ann. § 15-78-60(25).   As discussed recently by the South Carolina Supreme Court in *Bass v. South Carolina Department of Social Services,*

> Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do.  In other words, it is the failure to exercise slight care.  Gross negligence has also been defined as a relative term and means the absence of care that is necessary under the circumstances.

414 S.C. 558, 571-2, 780 S.E.2d 252, 258-9 (2015) (citations omitted).

Here, the circumstances warranted significantly greater care on the part of the Defendant District.  According to Defendant Spigner, who was responsible for coordinating the prom, there were over 600 students at the School's prom in 2014, including Plaintiff.  (Spigner Depo., pp. 11, 28.)  Mr. Spigner admitted that, while he was responsible for administrative and chaperone "coverage," he had never made provisions for nurses to be at the prom, even though he knew that there were students at the school who were subject to individualized health plans.  (Spigner Depo., pp. 11, 14, 21-22, 28).  Spigner also had not reviewed Plaintiff's individualized health plan prior to the prom to determine whether medical assistance might be needed for Plaintiff's protection during the event.  (Spigner Depo., pp. 21-22.)

---

[5] Plaintiff concedes that the proper defendant as to the negligence claims is the Defendant District.

When it came to providing protections for disabled students, Mr. Spigner only seemed concerned about the "profoundly handicapped," a label he appeared to give to students with disabilities affecting their mobility. (Spigner Depo., pp. 16-17.) Though he testified that he learned of needed accommodations through teachers or parents, there was no notice in the prom guidelines (Spigner Depo., p. 15, Ex. 1), prepared under his watch, to alert disabled students or their parents that it was incumbent upon them to request the medical assistance at the prom that they could already expect at school. (Spigner Depo., pp. 15-18.) Spigner testified to no affirmative steps on the part of the District to ascertain whether accommodations needed to be made for disabled students, such as Plaintiff, attending the prom.

The other Individual Defendants agreed that no such care was taken regarding students with medical needs. Defendant Trout, one of the administrators attending the prom, testified that there was no process for a nurse to communicate with a teacher or administration about a student's particular individualized health plan, nor was there a process in place by which nurses, who were not required to attend the prom, could communicate with chaperoning faculty and staff. (Trout Depo., pp. 18-20). Defendant Price testified that he reviewed no student 504 plan or individualized health plan before the prom. (Price Depo., p. 30.)

Pursuant to S.C. Code Ann. § 59-63-80, however, the District was required to develop and follow an individual health care plan for Cameron, whose diabetes required him to self-medicate.[6]

---

[6] In *Williams v. Hill Mfg. Co.*, this Court observed the following regarding claims of negligence *per se*,

> In determining whether a civil action may be based upon the violation of a statute, the courts apply one or more of a number of tests, all of which seem to embody the same general idea. Three of the most commonly applied are: (1) Whether the legislature intended to create a private liability, as distinguished from one of a public character; (2) whether the person injured is a person or a member of a class

15

The District's policy, required by the statute, represents to parents and students that "the [D]istrict will provide certain students with special healthcare needs and individual healthcare plan. This plan will meet the needs of the student for health monitoring and care during the school day or *at school-sponsored events*." (Price Depo., p. 36, Ex. 1 at 1). (emphasis added).

  Here, Cameron's IHP required the involvement of a nurse and trained staff in the event of more severe hypoglycemia, which can be life threatening. (T. Kelly Depo., p. 135, Ex. 4 at 1.) Though the administration and law enforcement anticipated that some students may exhibit signs of intoxication, nothing was in place to conduct breathylzer examinations or protect the disabled students whose conditions could mirror the same symptoms. (C. Kelly Aff., par. 8; T. Kelly Aff., pars. 8, 13, and 16; T. Kelly Depo, p.135, Ex. 4; L. Grazioli Depo., pp. 19-22.) There was no nurse at the prom, nor were arrangements made for chaperoning faculty and staff to have prompt contact with a nurse. While the District knew that Cameron would be attending the prom, no steps were taken to ensure that the provisions of the District's own policy and Cameron's lawfully-mandated Individual Healthcare Plan would be addressed at the prom. In fact, none of the administrators or law enforcement involved in interrogating, disciplining, and humiliating Cameron had knowledge of his diabetic condition, nor had the District identified and shared with them the Individual Healthcare Plan of any student before the prom. (L. Grazioli Depo., p. 25.) Nothing in the District's policies or the Individual Healthcare Plan warned parents of diabetic students that they were responsible for reiterating the need for accommodations that were already set forth in the

---

    for whose benefit the law is enacted; and (3) whether the injury complained of was
    such as the enactment was intended to prevent.

489 F.Supp. 20, 21-22 (D.S.C. 1980)(internal citations omitted.) Here, the statute is one intended for the protection of individual students such as Cameron, rather than the public generally. Had the protections of the statute and the policy required by the statute been followed, the damages suffered by Cameron would have been prevented.

16

Individual Healthcare Plan, which, by District policy, applied at school-sponsored events such as the prom. Despite District policy, and the availability of Cameron's parents' phone numbers to the District, no one contacted his parents when Cameron exhibited symptoms of hypoglycemia. (T. Kelly Aff., pp. 1-2; T. Kelly Depo., pp. 135-36.)

For all of the foregoing reasons, there was a clear and total lack of care undertaken by the District under the circumstances such that the District cannot meet its burden of establishing immunity due. Accordingly, summary judgment should be granted in favor of Plaintiff due to the District's gross negligence, and the District's Motion for Summary Judgment should be denied.

**2. There Is A Genuine Issue Of Material Fact As To Plaintiff's Damages Resulting From The Defendant District's Gross Negligence.**

Though the District contends that Plaintiff has suffered no "tort-related injury or damages," the District's attempts to minimize his damages should be rejected. The District's acts have not caused Plaintiff mere "inconvenience" or been "minimally damaging," as the District claims, nor are they analogous to an interference lasting minutes. Following the humiliating events of the prom, Plaintiff was subjected to harassment and forced to go to counseling. (C. Kelly Depo., pp. 92-93 and 110-111.) Plaintiff testified that he felt "belittled like [he] was in elementary school again" when other students learned that he was being accused falsely of drinking alcohol at the prom and called to the principal's office. (C. Kelly Depo., pp. 75-78.) Cameron testified that the time when he was suspended was a "very difficult time" and that he had to seek medical attention regarding the anxiety he suffered following the prom, which caused him to have difficulty sleeping and functioning all together. (C. Kelly Depo., pp. 91-92.) According to Plaintiff, he suffered strained relationships with his family and people at school, financial worry due to having to pay for a lawyer for discipline resulting from his diabetes and false accusations, fear of loss of his reputation and a disruption of his career path, and angst regarding his ability to finish his courses

for certification and transfer credit. (C. Kelly, p. 99.) The stress and anxiety caused Plaintiff to suffer physical manifestations of his angst, take medication for the anxiety, and have suicidal thoughts. (C. Kelly Aff., par. 10.) In fact, in Plaintiff's deposition almost two years after the prom,

> I still feel anxious about it to this day, and I feel as if my blood sugar is high, my blood pressure is high even right now. It's worrisome. I've never had to deal with this before. It's the first time I've been in trouble, so or it was the first time I was in trouble, so it was just really scary for me.

(C. Kelly Depo., p. 105). It also caused and continues to cause stress for his family members, which causes him further stress and anxiety. (C. Kelly Depo., pp. 105-8.) He describes the events as "traumatic." (C. Kelly Depo., p. 105.)

His mother also testified that the District's acts "definitely affected him…in a lot of ways." (T. Kelly Depo., p. 126.) He could not register for college when he was up for expulsion and was unable to register for desired courses. (T. Kelly Depo., pp. 125-28.) She testified that the stress of the issues still "lingers" and that Plaintiff now struggles and has a lack of trust in authority figures. (T. Kelly Depo., pp. 125-26.)

Contrary to the District's contention, it is well-settled that compensation is available for physical and mental suffering caused by a tortfeasor. The damages here are extensive and should be determined by a jury. In light of Plaintiff's extensive damages that continue to the present and the genuine issue of material fact as to that issue, Defendant's motion for summary judgment should be denied as to Plaintiff's negligence claim.

**(Signature Block Is On The Next Page)**

**DICKEY LAW GROUP, LLC**

By: s/Joseph D. Dickey, Jr.
    Joseph D. Dickey, Jr.
    Fed. Bar No. 11311
    1817 Hampton Street
    Columbia, SC 29201
    Email: joseph@dickeylawsc.com
    Phone: (803) 380-5575
    Fax: (803) 380-5576

and

**SARVIS LAW, LLC**

    Bryn Colette Sarvis Rice
    Fed. Bar No. 10478
    3347-B Augusta Hwy.
    Gilbert, SC 29054
    Email: bsarvis@sarvislaw.com
    Phone: (803) 785-5525
    Fax: (803) 610-2655

***Attorneys for Plaintiff***

Columbia, South Carolina
July 15, 2016